UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| EDWARD MANDEL<br>    *Appellant*, | : <br> : <br> : | CASE NO. 4:17-CV-261 |
| | : <br> : | Appeal from Bankruptcy |
| v. | : <br> : | Case No. 12-04127<br>Related to Bankruptcy Case No. 10- |
| WHITE NILE SOFTWARE, INC.,<br>ROSA R. ORENSTEIN, RECEIVER and<br>MASTROGIOVANNI, SCHORSCH and<br>MERSKY,<br>    *Appellees*. | : <br> : <br> : <br> : <br> : | 40219<br><br>JUDGE MICHAEL TRUNCALE |

## **MEMORANDUM OPINION ON APPEAL FROM BANKRUPTCY COURT**

I. **Procedural Background**

This appeal and related Case No. 4:17-CV-262 stem from a series of claims that involve a company called White Nile Software, Inc ("White Nile") formed by Debtor Edward Mandel ("Mandel") and his friend Steven Thrasher ("Thrasher"). Mandel and Thrasher formed White Nile in 2005 for the purpose of developing search engine technology. White Nile hired Jason Coleman ("Coleman") to work on several projects. On February 4, 2006, prior to the bankruptcy petition, state court litigation involving Mandel, Thrasher, and Coleman arose. On May 29, 2009, the state court appointed Rosa R. Orenstein ("Orenstein") as the Receiver for White Nile, and Mandel agreed to pay 52.5% of her fees. In September 2009, the state court issued an order (the "Receiver Counsel Order") approving Orenstein's designation of Mastrogiovanni, Schorsch & Mersky, P.C. ("MSM") as independent counsel for Orenstein. Orenstein sent Mandel a bill for $14,000 for attorney's fees related to the receivership. Mandel refused to pay the bill, and on January 25, 2010, Mandel filed for bankruptcy under Chapter 11.

Over the next two years, the bankruptcy court granted several motions by Thrasher,

White Nile, Orenstein and MSM to extend the deadline and approved a stipulation among the parties, including Mandel, to extend deadlines. On February 13, 2012, several of the Plaintiffs sought the appointment of a trustee in the Chapter 11 proceeding. The bankruptcy court conducted a hearing on the matter and on June 18, 2012, the court appointed Milo Segner as the Chapter 11 trustee after granting the a motion filed by the Plaintiffs.

On August 22, 2012, White Nile Software, Rosa Orenstein, and MSM filed an adversary complaint against Mandel. The bankruptcy court assigned the proceeding number 12-4127.[1] On the same day, Thrasher, on behalf of White Nile and in his individual capacity, Jason Coleman, Maddenswell LLP, and the Law Offices of Mitchell Madden filed their own adversary complaint against Mandel. The bankruptcy court assigned that proceeding the number 12-4128.

. The parties in the Orenstein proceeding objected to Mandel's discharge under 11 U.S.C §§ 727(a)(2), (a)(3) and (a)(4) as well as 11 U.S.C § § 523(a)(2)(A), (a)(4) and (a)(6). The parties in the Thrasher proceeding filed claims for unliquidated damages against Mandel's bankruptcy estate and objected to Mandel's discharge under 11 U.S.C 727(a)(2)(A) and (B), (a)(3) and (a)(4), they also objected to discharge under 11 §§ 523(a)(2)(A), (a)(4) and (a)(6). Mandel objected to the allowance of these claims. The bankruptcy court tried these claims and entered a decision and order awarding $1,000,000 to Thrasher, $400,000 to Coleman, and $300,000 to White Nile. *See In re Mandel*, 2011 WL 4599969 (Bankr. E.D. Tex. 2011). Additionally, the bankruptcy court ordered Thrasher and Coleman their reasonable attorney's fees in the total amount of $1,500,000. *See Id.*

As relevant to the current appeal, the bankruptcy court made the following findings and

---

1 The bankruptcy court called 12-4127 the "Orenstein proceeding" and 12-4128 the "Thrasher proceeding" for clarity, this court refers to them as the same.

2

reached the following conclusions:

> Mandel breached his fiduciary duties as an officer of White Nile by failing to preserve White Nile's Assets. In particular, Mandel failed to timely prosecute White Nile's patent rights and transferred money invested in White Nile to NeXplore Corporation, among other breaches.
>
> In order to induce Thrasher to go into business with him, Mandel misrepresented material facts to Thrasher, such as his intent to invest $300,000 of his own funds into White Nile, to develop its intellectual property.
>
> In order to obtain access to White Nile's intellectual property and trade secrets, Mandel fraudulently represented to White Nile that he had recruited an investor in the Philippines and that there was a team of highly qualified individuals in the Philippines working to develop White Niles intellectual property.
>
> In order to induce Coleman to become a consultant for White Nile, Thrasher made numerous false and inaccurate representations to Coleman.
>
> Mandel breached his obligations to Thrasher and White Nile under non-disclosure agreements he entered into with them.
>
> Mandel conspired with others to misappropriate and use White Nile's intellectual property.
>
> Mandel knowingly communicated White Nile's trade secrets to NeXplore.
>
> Mandel knew his actions were improper, but he did not act with the requisite malice to support an award of exemplary damages.

[Dkt. #1 Attachment 4 Pg6-7]. Mandel appealed to the district court. *See Mandel v. Thrasher*, WL 3367297 (E.D. Tex. 2013). The discount court affirmed the findings of the bankruptcy court on appeal. Mandel then appealed to the Fifth Circuit. The Fifth Circuit affirmed the bankruptcy court's findings of fact. *See In re Mandel*, 578 Fed. Appx. 376 (5th Cir. 2014). However, The Fifth Circuit remanded the issue of compensatory damages. [Dkt #1 Attachment 4 Pg 7].[2]

Meanwhile, Orenstein and independent counsel MSM filed independent claims against

---

2  The district court affirmed the bankruptcy courts award of compensatory damages on remand. *See Mandel v. Thrasher,* WL 7374428 (E.D.Tex. 2016). On appeal, the Fifth Circuit affirmed the district court's determination. *See matter of Mandel*, 720 Fed. Appx. 186 (5th Cir. 2018).

Mandel's bankruptcy estate seeking their fees related to the state court receivership of White Nile. Mandel objected to these claims. The bankruptcy court conducted a trial related to Orenstein's claims seeking fees. The bankruptcy court allowed Orenstein an unsecured claim of $315,535 for her reasonable and necessary fees as Receiver incurred through December 1, 2011. The bankruptcy court also allowed an unsecured claim of $155,517 for reasonable and necessary attorneys' fees incurred through December 1, 2011. The bankruptcy court found the following facts in its decision:

> Prior to Mandel's bankruptcy, on May 29, 2009, a state court entered an agreed order appointing Orenstein as the receiver for White Nile.
>
> The agreed order placed Orenstein in control of White Nile's claims against Mandel, among other things.
>
> The agreed order provided that Mandel would pay 52.5% of the receiver's fees.
>
> The agreed order required Mandel to pay the fees of the receiver herself as well as the fees of any counsel she retained.
>
> In an order dated September 15, 2009, the state court approved Orenstein's retention of MSM as independent counsel and required Mandel to pay 52.5% of the fees of the receiver's counsel. The state court also approved the fees of Orenstein and MSM through September 9, 2009, specifically finding their fees to be fair, reasonable, and necessary.
>
> In the state court proceeding, Mandel claimed that he did not have the financial resources to pay his portion of all the fees charged by Orenstein and MSM
>
> In the state court proceeding, Orenstein conducted discovery regarding Mandel's financial ability to pay pursuant to orders issued by the state court.
>
> Orenstein testified, credibly, that she had to fight to get business and financial information from Mandel and that Mandel's business structure and finances are unusually complicated.
>
> Orenstein filed two motions to compel Mandel to respond to her discovery requests in the state court proceeding, and the state court ordered Mandel to comply.

[Dkt. #1 Attachment 4 Pg. 8-9]. Mandel appealed the bankruptcy court's order. The district court dismissed the appeal for lack of standing. The Fifth Circuit reversed and remanded the

4

appeal to the district court, finding that Mandel did have standing. *See In re Mandel*, 641 Fed.Appx. 400 (5th Cir. 2016). On remand, the district court affirmed the findings of the Bankruptcy Court. *See In re Mandel*, WL 1197117 (E.D.Tex. 2017). On appeal to the Fifth Circuit, Mandel only challenged "the legal findings to support the fee award – not the specific numeric amounts awarded" *Id* at 960. The Fifth Circuit affirmed in part and reversed in part. The Fifth Circuit found that while the Receiver Counsel Order issued in state court did authorize Orenstein to have counsel, it did not authorize Orenstein to represent White Nile as a creditor in the bankruptcy proceeding, and therefore her retention of independent counsel to assist her in those matters would likewise not be authorized" *Id* at 964. The Fifth Circuit remanded only the award amount with regard to Orenstein and MSM.

Mandel filed a "Motion to Enforce Settlement Agreement and to Dismiss All Thrasher and Related Claims and Causes of Action" in the bankruptcy court. The motion, based on a mediated settlement agreement arising out of state court litigation regarding a fee-sharing agreement between Thrasher and Michael Shore, was heard by the bankruptcy court on September 4, 2013. In his motion, Mandel argued that because the mediated settlement agreement includes a release of claims, the bankruptcy court should find Mandel a party to that agreement and broadly construe the agreement to release all the claims of Thrasher and White Nile against Mandel. Thrasher, Coleman, Orenstein, and MSM objected, arguing that White Nile was not a party to the litigation, and that the bankruptcy court lacked jurisdiction to dismiss the pending claims because, at the time, the bankruptcy courts findings were on appeal.

After the September 4, 2013 hearing the bankruptcy court made the following findings of fact:

White Nile was not a party to the Thrasher/Shore Litigation.

The claims litigation in the bankruptcy court did not arise from or relate to the fee-

5

> sharing arrangement that was the subject of the dispute in the Thrasher/Shore litigation.
>
> Even if there was some reasonable argument that White Nile could be construed to be a claimant in the Thrasher/Shore litigation, Thrasher did not have the authority or capacity to individually waive or release White Nile's claims.
>
> The bankruptcy court found that its ruling was interlocutory and without prejudice to the parties to return to the state court for a determination of the enforcement of the settlement agreement.

[Dkt. #1 Attachment 4 Pg. 10-11]. Segner as trustee eventually moved to convert Mandel's case to a Chapter 7 proceeding due to the impossibility of confirming a plan of reorganization. The bankruptcy court granted the motion and entered an order converting the case to Chapter 7 on December 19, 2014. The deadline for objecting to Mandel's discharge or the dischargability of a particular debt was March 13, 2015.

Because the legal claims, evidence and legal arguments substantially overlapped, the bankruptcy court tried both the Thrasher claims and the Orenstein claims together over a four-day period. At trial, Thrasher, White Nile and Coleman sought to prove that the bankruptcy court's prior decision on the allowance of claims as affirmed by the Fifth Circuit established the required elements of non-dischargability under the bankruptcy code, 11 U.S.C §§ 523(a)(2)(A), (a)(4) and (a)(6). Orenstein and MSM pursued the same theories of non-dischargability as to the outstanding fees and expenses. The plaintiffs in both the Thrasher proceeding and the Orenstein proceeding sought a judgment denying the dischargability of Mandel's debts under 11 U.S.C. §§ 727(a)(2), (a)(3) and (a)(4).

**The Bankruptcy Courts Findings of Fact**

    A.  Background

The bankruptcy court found that Mandel is a sophisticated debtor. He holds an undergraduate degree in Computer Science and a Master's Degree in Business Administration. He has an ownership interest in numerous businesses. He has been involved in numerous

6

lawsuits, retained dozens of lawyers, and been involved in businesses for many years. The bankruptcy court found that Mandel directed litigation strategies for his numerous companies. The court found that Mandel owns and controls many businesses, including: NeXplore, Positive Software Solutions, Mandel Capital Partners, LP, Mandalay Villas, which he owns with his father, eFocus Solutions, Inc., Premier Debt Recovery Centers, Inc., as well as a real estate holding company. Most of these companies are controlled by Mandel Management Inc, which is owned and operated by Mandel and his wife, Irene. Mandel and his companies also own numerous tracts of land and homes.

Mandel brought litigation against Thrasher and Coleman in 2005 in state court. This litigation was discussed in depth in the bankruptcy courts decision entered on September 30, 2011, however as relevant here, the parties entered into a tentative settlement agreement in October of 2007. There was an agreed $900,000 judgment against Mandel if Mandel failed to make payments agreed to under the settlement agreement. In December of 2007, Mandel withdrew from the agreement, and in January of 2008, Mandel executed two quit claim deeds transferring two lots from his real estate holding company (Mandel Real Estate Partners, Ltd) to the Mandel Children's 2005 Irrevocable Trust (the "Mandel Children's Trust"). Mandel filed a petition in bankruptcy court on behalf of White Nile in the Northern District of Texas in an effort to stay the state court litigation, however, Thrasher filed a motion to dismiss the White Nile bankruptcy petition. That motion was granted. The following year, Mandel executed numerous quit claim deeds to the Mandel Children's Trust relating to numerous properties in Texas and Florida in a similar fashion to those executed from Mandel Real Estate Partners, Ltd. Mandel chose not to record the quit claim deeds, and taxes were still paid by the company from which Mandel had transferred ownership.

7

## B. Bankruptcy

Mandel filed his bankruptcy petition in January of 2010. The day before filing his bankruptcy petition, Positive Software transferred $50,000 to Mandel and his wife, $35,000 to his wife Irene Mandel in her individual bank account, and $80,000 to Americare. Mandel's first set of schedules were filed in February 2010. In those schedules, Mandel did not include the money he or his wife had received from Positive Software the day before filing the petition. Mandel instead included $400 in cash on hand and less than $15,000 in his personal bank accounts. Mandel amended his bankruptcy schedules multiple times. In doing so, he changed the valuations of his multiple companies, as well as his ownership interests in the companies.

A Chapter 11 trustee was eventually appointed, and Mandel was required to file additional reports. In one of those reports, Mandel repeatedly represented that Americare had over $1.2 million in cash in its bank accounts. This was false. He also listed numerous real estate lots in Florida in the amended schedules, all of which were subject to the quit claim deeds. None of the schedules or amended schedules reflected the quit claim deeds.

One of the listed claims was Mandel's interest in Positive Software, which possessed a $15 million bankruptcy claim against a company called New Century Mortgage and another $15 million against an entity called New Century Finance. This claim was sold during Mandel's bankruptcy for $3 million to an entity specializing in the purchase of bankruptcy claims. Approximately $1.3 million of that $3 million was used to pay legal fees associated with the settlement of claims, the other $1.7 million went to Positive Software's bank account. This money was immediately transferred to Americare pursuant to a "Subordinated Convertible Debenture" or a loan agreement. Mandel falsely recorded this debenture as cash. In the bankruptcy proceedings Mandel testified he thought that the debenture was the same as cash. The bankruptcy court did not find this testimony credible.

The bankruptcy court found that the transfer of Positive Software's assets to Americare was part of a scheme to hide assets from Mandel's estate and make it more difficult for creditors to find. [Dkt. #1 EXHIBIT 4 Pg27]. Mandel owned Americare through another company called Zulu Ventures which acquired a controlling interest in Americare when Mandel and his sold their controlling shares. The bankruptcy court further found that Mandel and his wife used Americare's funds for living expenses and did not include that money in Mandel's monthly operating reports filed with the bankruptcy court. Mandel testified further that he used a program called QuickBooks to keep track of his finances. He claimed that a computer crash had prevented him from presenting evidence of his financial condition and operating expenses. The bankruptcy court did not find this testimony credible.

II. **Issues Presented**

Mandel raises the following issues on appeal:

(1) Whether the bankruptcy court erred in denying Mandel's Motion to Enforce Settlement Agreement.

(2) Whether the bankruptcy court erred by denying Mandel's discharge under 11 U.S.C. 727 of the bankruptcy code.

(3) Whether the bankruptcy court erred by finding Orenstein and MSM's debts non-dischargeable under 11 U.S.C 523(a)(2)(A).

A. **Standard of Review**

A bankruptcy court's findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses. Bankruptcy Rule 8013; *see also Matter of Herby's Foods, Inc.*, 2 F.3d 128, 130-31 (5th Cir. 1992). A finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed." *Matter of Missionary Baptist Foundation of America Inc.*, 712

F.2d 206, 209 (5th Cir. 1983) (quoting *United States v. United States Gypsum Co.*, 333 U.S. (1948)).

Issues of law are reviewed de novo as are mixed questions of fact and law. *In re CPDC, Inc.*, 337 F.3d 436, 441 (5th Cir. 2003). A finding of fact which is premised on an improper legal standard, or on a proper standard improperly applied, will also be reviewed *de novo*. *Missionary Baptist Foundation*, 712 F.2d 206, 209 (5th Cir. 1983) (*rev'd on other grounds*).

### B. Analysis

1. **The Bankruptcy Court Did Not Err in Denying Debtor's *Omnibus Motion to Enforce Settlement Agreement*.**

   i. **Procedural Bar**

Mandel argues that the bankruptcy court erred when it did not enforce the mediated settlement agreement. In response, Appellees, Orenstein, White Nile, and MSM, Orenstein's independent counsel, correctly note that the claim is procedurally barred by Federal Rule of Bankruptcy Procedure 8009(a)(1)(A) because Appellant did not raise it in his statement of the issues on appeal. Rule 8009(a)(1)(A) states, in pertinent part,

> (a) Designating the Record on Appeal; Statement of the Issues.
> (1) Appellant.
> (A) The appellant must file with the bankruptcy clerk and serve on the appellee a designation of the items to be included in the record on appeal and a statement of the issues to be presented.
> (B) The appellant must file and serve the designation and statement within 14 days after:
> (i) the appellant's notice of appeal as of right becomes effective under Rule 8002; or
> (ii) an order granting leave to appeal is entered.

Mandel does not contend that the issue was raised in his statement of issues, but instead argues that the failure to designate the issue is the result of excusable neglect and therefore this court should consider the issue despite the procedural bar. An issue is not preserved for appeal unless the appellant includes an issue in the statement of issues on appeal. *In re GGM, P.C.*, 165 F.3d 1026, 1032 (5th Cir. 1999).

However, the Fifth Circuit has held that 'dismissal is a harsh and drastic sanction that is not appropriate in all cases, even though it lies within the district courts discretion." *In the Matter of CPDC Inc.*, 221 F.3d 693, 699 (5th Cir. 2000). The four factor test a district court must utilize to determine whether or not a claim should be procedurally barred or dismissed is: "(1) a finding of bad faith or negligence; (2) give appellant notice or opportunity to explain the delay; (3) consider possible prejudicial effect of delay on other parties and (4) consider the impact of the sanctions and available alternatives." *Id* at 699-700.

Appellees do not point to any prejudice they have suffered by the delay. Mandel points to the late retention of counsel and the unusually complex nature of the proceedings to combat a finding of bad faith and explain the delay. This court finds that Mandel's late filing was due to excusable delay and will proceed to consider the merits of the argument.

ii. **Collateral estoppel**

Mandel argues that the bankruptcy court erred in not enforcing a settlement agreement between Thrasher and Shore as to claims involving White Nile and Thrasher against Mandel. Appellees counter by arguing that Mandel is collaterally estopped from making this argument on appeal. In support of the collateral estoppel argument, Appellees point to the tortured history of this litigation, and indicates that there is a Fifth Circuit opinion allowing claims by both White Nile and Thrasher against Mandel. Further, there is a decision from the Texas Fifth District Court of Appeals ("Appellate State Court Order") dismissing Mandel's declaratory judgment action seeking the state court's approval of the Thrasher/Shore Settlement interpreted to include release of claims by third parties, including Appellees.

Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit" *Schiro v. Farley*, 510 U.S. 222, 232 (1994). Collateral estoppel

"prevents litigation of an issue when: (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision. *Bradberry v. Jefferson County, Tex.*, 732 F.3d 540, 550 (5th Cir. 2013).

Mandel's claim is collaterally estopped both under the traditional doctrine of collateral estoppel due to the Fifth Circuit's previous decision on the pending claims, and the *Rooker-Feldman* doctrine as a result of the Appellate State Court Order. The bankruptcy court determined that Coleman, Thrasher, and White Nile all had valid claims against the bankruptcy estate. *See In re Mandel* WL 4599969 (Bankr.E.D.Tex. 2011). While the Fifth Circuit reversed the bankruptcy courts finding as to the amount of damages, the Circuit found evidentiary support in the record for breach of contract, misappropriation of trade secrets, breach of fiduciary duty, conspiracy and fraudulent inducement. *See In re Mandel*, 578 Fed. Appx. 376 (5th Cir. 2014). In affirming the record evidence and affirming the claims of Coleman, Thrasher, and White Nile, the Fifth Circuit has precluded any further ruling on the issue of the settlement agreement by this court.

Further, Mandel fully litigated this issue in a hearing in the state court proceeding. The Fifth District Court of Appeals affirmed the state court's finding that Mandel could not enforce the settlement agreement. *See Depumpo v. Thrasher*. 2016 WL 147294 (Tex. App. – Dallas 2016). This court cannot reach the merits of the claim given the Fifth District Court of Appeals and Fifth Circuit decisions on point. *Exxon Mobile Corp v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 282 (2005).[3]

---

3      Additionally, where there is a full and final state court judgment, as here, the *Rooker-Feldman* doctrine applies. The *Rooker-Feldman* doctrine is "confined to cases…brought by state court losers complaining of injuries caused by-state court judgments rendered before the federal district court proceedings and inviting district court review and rejection of those judgments" *Exxon Mobil. Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 282 (2005).

## 2. The Bankruptcy Court Did Not Err in Denying Mandel's Discharge Under 11 U.S.C. 727 of the Bankruptcy Code.

At the outset, a bankruptcy court may deny a debtor's discharge only if the plaintiff can show a violation of § 727(a) by a preponderance of the evidence. *See In re Womble*, 289 B.R. 836, 844 (Bankr. N.D. Tex. 2003) (reaffirming use of a preponderance of evidence standard to prove each of the elements within § 727). Establishment of only a single sub-section of § 727(a) is sufficient to deny a debtor's discharge. *See In re Moseman*, 436 B.R. 398, 405 (Bankr. E.D.Tex 2010).

### I.  11 U.S.C. § 727(a)(3)

11 U.S.C §§ 727(a)(3) allows for an exception to discharge when

> (4) The debtor has concealed, destroyed, mutilated, falsified or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

Under § 727(a)(3) a plaintiff must show, by a preponderance of the evidence: (1) the debtor failed to maintain and preserve adequate records; and (2) such failure makes it impossible to ascertain his financial condition and material business transactions. *In re Dennis*, 330 F. 3d 696, 703 (5th Cir. 2003). The objecting party bears "the initial burden to prove that [debtor] failed to keep and preserve her financial records and that this failure prevented him from ascertaining her financial condition" *In re Sandler*, 282 B.R. 254, 263 (Bankr. M.D.Fla. 2002). The debtor's burden to maintain and preserve records is not onerous, financial records need not contain full detail, only "some written evidence of the debtors financial condition" *In re Goff*, 495 F.2d 199, 201 (5th Cir. 1974).[4] However, § 727(a)(3) does not require a demonstration of fraudulent intent, negligence will suffice to bar discharge. *In re Henley*, 480 B.R. 780, 781

---

4    The Fifth Circuit notes in *Dennis* that *Goff* interprets an older version of the statute. However, that version is materially identical to the current one. *See in re Dennis*, 330 F.3d 696, 703. (5th Cir. 2003).

13

(Bankr.S.D.Tex. 2012). In preserving business and finance records, sophisticated debtors may be held to a higher standard. *See In re Jones*, 237 B.R. 297, 305 (S.D.Tex. 2005).

Without question, Mandel is a sophisticated businessman who was the owner, manager, president, or CEO of more than ten entities. Mandel has engaged the advice of dozens of attorneys and has been engaged in more than fifteen lawsuits. There have been eleven appeals stemming from this bankruptcy action alone. The bankruptcy court found that (1) Mandel failed to maintain accurate records based on back-dating documents, that Mandel (2) falsified records in maintaining his business finances, (3) Mandel failed to disclose or keep adequate records of transfers between Positive to Americare, and (4) Mandel was not keeping adequate business before or after the alleged computer crash, and therefore the testimony regarding the corruption was not credible. Further, Mandel obstructed the recovery of information related to financial documents at every turn. Multiple motions to compel were litigated in the bankruptcy proceeding as well as the state court proceeding once Orenstein was appointed as Receiver. Indeed, the trustee appointed referred to recovery of documents as having to "pull teeth." Based on the credible evidence admitted at trial, the bankruptcy court did not commit clear error in denying discharge under 11 U.S.C 727 § (a)(3). The record demonstrates a lengthy, complicated bankruptcy proceeding that was frustrated by Mandel's behavior and lack of cooperation.

The bankruptcy court found that "Mandel falsified the books and records of several of his businesses by omitting the execution of quit claim deeds to the Mandel Children's Trust, and he did not record the deeds publicly." [Dkt. #1 EXHIBIT 4, Pg46]. In this appeal, Mandel argues that, "Debtor is not a lawyer, and did not understand the legal implications of an unrecorded deed." [Dkt. #15 pg17]. This argument strains credibility. The record evidence demonstrates, and the bankruptcy court found that Mandel is a sophisticated businessman. Mandel consulted with lawyers on every aspect of his businesses. There is no evidence

supporting the assertion that Mandel should be held to a lesser standard because he's not an attorney with regard to the quit claim deeds he executed just days prior to declaring bankruptcy, nor should Mandel be held to a lesser standard as to the quit claim deeds Mandel executed during the bankruptcy. Mandel continued to pay property taxes and exercise control over the property using the company that had previously owned the lot of land. There is no legitimate purpose in doing so other than to obfuscate the proceeding. Further, he never disclosed the quit claim deeds he executed. There is ample record evidence for the conclusion the bankruptcy court made, that Mandel simply did not want the properties to be part of the bankruptcy and therefore executed a deed to his children in an effort to hide the properties.

Mandel further argues that this court should make a factual determination contrary to the fact findings of the bankruptcy court in that, "Mandel also back-dated business documents to suit his needs, making it difficult or impossible to analyze the substance of some of his business dealings." [Dkt. #15 Pg. 19] and that the bankruptcy court erred in not finding Mandel's explanation that his computer had corrupted his QuickBooks account credible. This court declines to do so. Findings of fact in bankruptcy proceedings will not be set aside unless they are clearly erroneous. *In re Acis Capital Management*, *L.P.* 604 B.R. 484 (Bankr. N.D. Tex. 2019). An appellate court must afford great weight to the bankruptcy courts finding because the bankruptcy court is "in a far superior position to gauge the [debtors] credibility than a court that has been provided only with cold transcripts." *In re Acosta* 406 F.3d, 373-74 (5th Cir. 2005) (quoting *In re Martin* 963 F.2d 809, 814 (5th Cir. 1992)). Appellate points to no credible basis for disturbing the bankruptcy court's findings. This proceeding consisted of a lengthy, tortured history full of attempted concealment and adversarial proceedings. This court finds no reason to disturb the credibility findings of the bankruptcy court who handled this case for over five years, heard witness testimony and made credibility determinations based on more

than the "cold transcripts."

## II.     11 U.S.C. § 727(a)(4)

11 U.S.C § 727(a)(4) of the Bankruptcy Code provides, in relevant part, an exception to discharge when "(4) The debtor knowingly and fraudulently, in or in connection with the case – (a) made a false oath or account…" Under § 727(a)(4), the plaintiff in a bankruptcy proceeding must show that: (1) [Debtor] made a statement under oath; (2) the statement was false (3) debtor knew the statement was false; (4) [Debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *Matter of Beaubouef*, 966 F.2d 174 (5th Cir. 1992). "[T]he purpose of § 727(a)(4)(A) is to enforce a debtor's duty of disclosure and to ensure that the Debtor provides reliable information to those who have an interest in the administration of the estate." Thus, "complete financial disclosure is a condition precedent to the privilege of discharge." *In re Lindemann*, 375 B.R. 450, 469 (Bankr. N.D. Ill. 2007). A plaintiff in a § 727(a)(4)(A) bears the burden of demonstrating an actual intent to hinder, delay or defraud, further there must be more than a constructive intent, plaintiff must demonstrate evidence of actual intent to defraud creditors. *Matter of Chastant*, 873 F.2d 89, 91 (5th Cir. 1989). A debtor is usually the only person who can testify directly concerning intent, and "rare will be the debtor who willingly provides direct evidence of a fraudulent intent" *In re Darby*, 3766 B.R. 534, 541 (Bankr. E.D. Tex. 2007). Therefore, courts must look to a course of conduct in discovering fraudulent intent. *See In re Reed*, 700 F.2d 986, 991 (5th Cir. 1989). While fraudulent intent is required, "reckless indifference to the truth is sufficient to deny the debtor a discharge if the subject matter is material to the administration of the bankruptcy." *In re Kinard*, 518 B.R. 290, 305 (Bankr. E.D.Pa. 2014). A finding of materiality requires, "a relationship to the [debtor's] business transactions or estate, or concerns the discovery of assets, business dealings or the existence and disposition of his property." *In re Duncan*, 562 F.3d 688,

695. (5th Cir. 2009).

Mandel argues that he lacked the fraudulent intent required for a denial under § 727(a)(4). Mandel relies on many of the same factual and credibility disputes raised under § 727(a)(3), given the similar analysis. Mandel largely pleads ignorance with regard to failures to disclose, or that he made an honest mistake. Ultimately, Mandel argues that the statements were made in good faith and thus the elements of (1) knowledge of falsity and (2) fraudulent intent are lacking. This is incorrect.

Mandel submitted verified payment schedules to the court that he knew were false. Mandel omitted the income he received due to the transfer of assets from Americare from his operating reports. Mandel paid numerous personal expenses from various business funds and did not include those payments as income in his payment schedules. The schedules were provided under oath by Mandel. Mandel used the businesses to pay bills and then hid those transactions or failed to keep records of them and did not submit those records to the court. Mandel spent numerous hours with numerous bankruptcy attorneys drafting his initial schedules. After the errors were pointed out, he spent numerous hours with new counsel correcting the schedules, and they still contained errors. The bankruptcy court did not credit Mandel's testimony that he had been advised by his attorneys not to include the payments from Americare.

It would overstep this court's scope of review for this court to now find that those errors were unintentional, or not a "reckless indifference to the truth" and therefore reverse the bankruptcy courts finding as to fraudulent intent. It is equally not credible that Mandel was blind to the obvious falsity of the records. The court found Mandel to be a sophisticated debtor who was operating sophisticated businesses and was assisted by sophisticated counsel. This court finds no basis to disturb the bankruptcy court's credibility findings and now find that

Mandel instead had was totally blind-sided and unable to maintain accounting records.

   3. **The bankruptcy court did not err by finding Orenstein and MSM's debts non-dischargeable under 11 U.S.C § 523(a)(2)(A).**

11 U.S.C § 523(a)(2)(A) prevents a discharge in bankruptcy when, "(2) for money, property, services or an extension, renewal or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." In a decision entered on September 30, 2011, the bankruptcy court found that Thrasher, on his own behalf and on behalf of White Nile and Coleman, had established claims against Mandel for fraud under Texas law. The bankruptcy court found that based on the finding of fraud, Mandel was precluded from discharge, and that those debts were nondischargable under § 523(a)(2)(A). With regard to Orenstein and MSM, the bankruptcy court found that Mandel entered into an agreed receiver order without any intent to comply with the agreement. The court found that based on Mandel's untruthful representation of indigency to the state court with regard to the $14,000 outstanding fee, and that Mandel continued to move assets around to avoid paying the outstanding receivership fee, Mandel had committed fraud was denied discharged under 11 U.S.C. 523(a)(2)(A).

Appellant argues that because Mandel was not contemplating attorney's fees when he entered into the Receivership Agreement, he did not engage in fraud in attempting to avoid paying those fees because he honestly never thought he had to pay attorney's fees. This is a collateral attack on the Fifth Circuits ruling on the Affirmed Claim Allowance, and therefore, Mandel is collaterally estopped from raising it. *Matter of Mandel*, 747 Fed. Appx. 955, 963 (5th Cir. 2018) ("[T]he bankruptcy court did not err in awarding fees for attorneys retained in the attempt to collect Mandel's share of the receivership payments"). Alternatively, the court finds the record is littered with evidence that based on the false statements to the state court, Mandel's

ability to move funds to his various entities and family members, and because Mandel's recordkeeping was poor, the bankruptcy court committed no error in finding that Mandel had no intention to pay the outstanding fees for the receivership.

Mandel next argues that because the bankruptcy court erred in its reliance on the agreed order to find fraud, Appellees may only proceed on a traditional § 523(a)(2)(A) allegation. Even if this were the case, Appellant's argument fails. Based on a traditional theory of § 523(a)(2)(A), the plaintiff must show (1) the debtor made representations (2) at the time they were made the debtor knew they were false, (3) the debtor made the representations with the intention and purpose to deceive the creditor, and that (4) the creditor justifiably relied on such representations. Appellant argues that Appellees did not prove justified reliance.

In assessing a claim of justified reliance, this court is required to utilize the clear error standard. *In re Riebesell*, 586 F.3d 782, 792 (10th Cir. 2009). Clear error will be found only where there "the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances" *In re Stewart*, 604 B.R. 900, 905 (Bankr. W.D. Okla. 2019). The bankruptcy courts decision was based on a sufficient factual basis to determine that Appellees justifiably relied on Mandel's representations of his finances. Mandel represented that he could not pay the $14,000 attorney's fees, and his finances were not publicly available. Moreover, Mandel obstructed every attempt to investigate his finances. The bankruptcy court was correct to determine that the based on what was publicly available at the time, Appellees were justified in relying on Mandel's representations.

Finally, Appellant argues that the bankruptcy court erred in its reliance on *Husky v. Internatioal Electronics, Inc. v. Ritz,* 136 S.Ct. 1581 (2016) because there is no evidence that Mandel attempted to "drain" his companies of assets in an attempt to avoid paying Appellees. That is not the case. Appellant transferred real estate from Mandel Real Estate Partners, Mandel

Capital Partners and Premier Debt Recovery Centers to the Mandel Children's Trust. Those transfers were concealed from the court and appellees. Mandel repeatedly moved money to and from businesses in an attempt to appear insolvent. As referenced herein, the record is overflowing with evidence that Mandel attempted to conceal assets and made false statements regarding his assets. The bankruptcy court's factual findings do not rise to the level of "clearly erroneous."

III. **Conclusion**

IT IS THEREFORE ORDERED that the bankruptcy court's March 31, 2017 Findings of Fact and Conclusions of Law [Dkt. #112] and March 31, 2017 Judgment [Dkt. #113] are AFFIRMED.

**SIGNED this 19th day of December, 2019.**

Michael J. Truncale
United States District Judge